## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO: 21-cv-60115-RKA

**BIANCA FERNANDEZ**,

    *Plaintiff*,

*v.*

**HOTWIRE COMMUNICATIONS, LTD.**,

    *Defendant*.

_____/

### <u>ORDER</u>

Our Plaintiff, Bianca Fernandez, was an account manager at Hotwire Communications, where she "was responsible for the overall good health of the properties" she managed. Seven months into her tenure, though, Hotwire fired her as part of a reduction-in-force the company undertook at the outset of the COVID-19 pandemic. Hotwire says it fired Fernandez because she exhibited "numerous performance deficiencies"—among these: "consistently ha[ving] difficulty following up on action items and completing requested tasks in a timely manner"; "ignorance" of, and failure to perform, her basic "job duties"; and a propensity for allowing company equipment under her care to deteriorate. Because of these deficiencies, one of Fernandez's clients asked that she be removed from handling its account, and another threatened to sue Hotwire. Fernandez—unhappy with her termination—now claims that she was *actually* fired because of her age and sex. But no reasonable jury could find that Hotwire dismissed her for a discriminatory reason. After careful review, therefore, we **GRANT** Hotwire's Motion for Summary Judgment ("MSJ") [ECF No. 57].[1]

---

[1] The MSJ is fully briefed and ripe for adjudication. *See* Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment ("Response") [ECF No. 60]; Defendant's Reply in Support of Motion for Summary Judgment ("Reply") [ECF No. 65].

**THE FACTS**[2]

On May 4, 2015, Fernandez started as a Residential Sales Specialist with Hotwire Communications, an internet service provider. *See* Joint Statement of Undisputed Facts ("JSOF") [ECF No. 56] ¶ 1. "In or around September 2019," Fernandez was promoted to "Account Manager." *Id.* ¶ 2. As an account manager, Fernandez "was responsible for the overall good health of the properties to which she was assigned[.]" Defendant's Statement of Facts ("Def.'s SOF") [ECF No. 55] ¶ 3; *see also* Plaintiff's Response Statement of Material Facts ("Pl.'s SOF") [ECF No. 59] ¶ 3 ("Undisputed."). "Once [Fernandez] became an Account Manager, [she] was presented with, and signed, an Account Manager Accountability Checklist." Decl. of Bianca Fernandez ("Fernandez Decl.") [ECF No. 58-1] ¶ 4. Fernandez's immediate supervisor, Shannon Stephan, "met with [her] to go over the essential job functions of the position by reviewing the Account Manager Accountability

---

[2] "The facts are described in the light most favorable to [the plaintiff]." *Plott v. NCL Am., LLC*, 786 F. App'x 199, 201 (11th Cir. 2019); *see also Lee v. Ferraro*, 284 F.3d 1188, 1190 (11th Cir. 2002) ("[F]or summary judgment purposes, our analysis must begin with a description of the facts in the light most favorable to the [non-movant]."). We accept these facts for summary-judgment purposes *only* and recognize that "[t]hey may not be the actual facts that could be established through live testimony at trial." *Snac Lite, LLC v. Nuts 'N More, LLC*, 2016 WL 6778268, at *1 n.1 (N.D. Ala. Nov. 16, 2016); *see also Cox Adm'r US Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994) ("[W]hat we state as 'facts' in this opinion for purposes of reviewing the rulings on the summary judgment motion may not be the actual facts. They are, however, the facts for present purposes[.]" (cleaned up)). In considering Hotwire's MSJ, then, we describe the facts in the light most favorable to Fernandez— drawing mostly from the parties' Joint Statement of Material Facts ("JSOF") [ECF No. 56] and Fernandez's Response Statement of Material Facts ("Pl.'s SOF") [ECF No. 59]. We thus rely on Hotwire's Statement of Facts ("Def.'s SOF") [ECF No. 55] *only* where Fernandez has failed to genuinely dispute a proposition Hotwire has asserted there. *See* S.D. FLA. L.R. 56.1(b) ("All material facts set forth in the movant's statement filed and supported as required above will be deemed admitted unless controverted by the opposing party's statement provided that the Court finds that the movant's statement is supported by evidence in the record.").

Checklist." Def.'s SOF ¶ 6; *see also* Pl.'s SOF ¶ 6 (failing to genuinely dispute this fact).[3] The Checklist

included the following expectations:

- "On site visits. Make sure that you visit personally with each assigned Property Manager at least 1x-2x per month";
- "Inspect HE [Hotwire Equipment], Access Points, Common Area equipment on site to ensure quality control";
- "Be able to speak to where Hotwires [sic] infrastructure lies within the community and the surrounding area";
- "Keeping track of A/R (Aging Report) on all properties";
- "Submit all Mileage, Expenses and Time off requests in a timely manner"; and
- "Have an active list of all properties and basic information[.]"

Account Management Accountability Checklist (the "Checklist") [ECF No. 55-1] at 261.

Fernandez "acknowledged [these] essential job functions," Fernandez Decl. ¶ 5, but now

claims that "[she] had no idea what any of the responsibilities listed entailed, but expected to be taught

through training," *id.* ¶ 4. The thing is: Fernandez *was* "provided with training that included shadowing

other Account Managers for approximately one month before [she] was assigned to any properties of

her own." Def.'s SOF ¶ 8; Pl.'s SOF ¶ 8 (failing to genuinely dispute this fact).[4] Stephan also

---

[3] Fernandez maintains that she "was never shown, told, or trained to inspect Hotwire equipment when she became an Account Manager." Pl.'s SOF ¶ 6. She insists that, "while [she] acknowledged [her] essential job functions [on the Checklist], [she] never received any documented training in my new position, on my new responsibilities." Fernandez Decl. ¶ 5. But she doesn't dispute the fact that her supervisor, Stephan, went over the Checklist with her—and that she (and Stephan) signed and dated the Checklist, thus attesting that she would "be the eyes and ears of quality of service at the community," "escalate to senior management any known property issue," and "[i]nspect [Hotwire Equipment], Access Points, [and] Common Area equipment." Checklist [ECF No. 255-1] at 261. In short, Fernandez hasn't created a genuine dispute of material fact on this issue. *Cf. RLI Ins. Co. v. Alfonso*, 2021 WL 430720, at *7 (S.D. Fla. Feb. 8, 2021) (Altman, J.) ("Once the moving party satisfies its initial burden, the burden then shifts to the non-moving party to come forward with specific facts showing there is a genuine issue for trial." (cleaned up)).

[4] Trying to dispute this proposition, Fernandez tells us that she was "never trained on how to perform a walk-around of a property." Pl.'s SOF ¶ 8. That may be—but it doesn't contradict the Defendant's asserted fact, which is that she was trained on her *general* job responsibilities. In other words, that she didn't receive training on how to perform a *walk-around* doesn't establish that she received *no training at all*. Fernandez (it's true) does *also* attest that she "never received any documented training in [her] new position." Fernandez Decl. ¶ 5. But, elsewhere in the same declaration, she swore that her "training consisted of shadowing other Account Managers[.]" *Id.* ¶ 7. What's more, in her deposition, Fernandez testified that "[she] would shadow people," and that "[Stephan] was out with [her]—you

"repeatedly advised [Fernandez] . . . that she has an 'open door' policy and to come to her with any questions at any time." JSOF ¶ 9. Trying to stave off summary judgment, however, Fernandez now claims that Stephan didn't teach her about "walkouts," Fernandez Decl. ¶ 7—a critical component in any survey of a client's property, *see* Stephan Depo. at 43:7–8 (noting that walkouts are "obviously a very basic essential function of [Fernandez's] job"). Viewing the evidence in the light most favorable to Fernandez—as we must at this stage of the case—we'll accept this as a genuine dispute on the narrow question of whether Stephan trained Fernandez on how a "walkout" should be conducted. As we'll see, though, this dispute isn't material to the central issue in this case—which is whether Hotwire fired Fernandez *because* she's a woman or *because* she's over 40. This dispute—though genuine—thus isn't enough to withstand summary judgment.

After about two months on the job, things began to devolve. Stephan testified that Fernandez "would not follow up with the properties," and that "she also was not giving the mileage that she's supposed to correctly." Stephan Depo. at 24:24–25:4; *see also* Def.'s SOF ¶¶ 10, 11; Pl.'s SOF ¶¶ 10, 11 (failing to genuinely dispute this fact).[5] "[I]n or around December 2019, Ms. Stephan first began discussing Plaintiff's performance issues with Hotwire's Executive Vice President of the Palm Beach Region, Carl Lender . . . at the time she conducted a total staff performance review." Def.'s SOF ¶ 12;

---

know, training. [Stephan] did a lot of things with me." Depo. of Bianca Fernandez ("Fernandez Depo.") [ECF No. 55-1] at 138:17–19. Fernandez's declaration thus fails to create a genuine issue of material fact on this issue because it doesn't explain the intractable contradiction between what she said in her sworn deposition—which was corroborated by Stephan's own testimony—and what she, trying to salvage her case at summary judgment, later wrote down in her declaration. *See Van T. Junkins & Assocs., Inc. v. U.S. Indus., Inc.*, 736 F.2d 656, 657 (11th Cir. 1984) ("When a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact, that party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony.").

[5] Fernandez contests these allegations by asserting that she was never *told* about these problems. *See* Pl.'s SOF ¶¶ 10, 11 ("Ms. Stephan repeatedly expressed to Plaintiff that she was doing a good job."). But she never actually *defends* herself against the allegations by asserting that she *did* follow up or that she *did* submit her mileage correctly.

Pl.'s SOF ¶ 12 (failing to genuinely dispute this fact).[6] Major issues at two of Fernandez's assigned properties quickly followed.

At the Club of Indian Lakes (one of Fernandez's assigned locations, *see* JSOF ¶ 13), Carl Lender testified that the association president "directly contacted him to request that Plaintiff be removed from handling their account," *id.* ¶ 14. According to Lender, the club complained because "they weren't happy with [Fernandez] as their account manager and they wanted her removed." Depo. of Carl Lender ("Lender Depo.") [ECF No. 55-3] at 39:23–25.[7]

In early 2020, Fernandez also ran into problems at Harbour Oaks—another of her assigned properties. *See* JSOF ¶ 15. Concerned that Fernandez was "kind of like a red flag," Lender Depo. at 40:12, Lender checked up on her at Harbour Oaks and "suggested that he and [Fernandez] walk around the [ ] property together to examine the condition of Hotwire's equipment on site," Def.'s SOF ¶ 16; Pl.'s SOF ¶ 16 (disputing only whether the walk-around occurred in January or February

---

[6] Fernandez argues that she "never received a performance review." Pl.'s SOF ¶ 12. But whether Fernandez was told about this review isn't nearly the point. The question is whether Stephan and Lender reviewed Fernandez's performance together—not whether someone told Fernandez about their review. Since Fernandez wasn't there when the review took place—and since no one who was there has contested Stephan's account—Fernandez has failed to genuinely dispute this proposition.

[7] According to Fernandez, Stephan told her that the club asked for her removal, "not because of [her] performance, [but] rather [because of] the property managers [sic] preference for their old account manager." Fernandez Decl. ¶ 12 (errors in original). We don't really care, though, *why* the property manager asked for her removal. All that matters is that a client asked for her to be removed—and that Hotwire felt dutybound to comply. And there's nothing wrong with firing an employee when a client complains about her. *See Versfelt v. Sanza Food Serv., LLC*, 2022 WL 479881, at *15 (S.D. Fla. Feb. 16, 2022) (Altman, J.) ("Are we really going to prohibit companies from firing employees who damage the companies' relationships with important external stakeholders?"). In complying with the client's demands, to be sure, Hotwire may have been mistaken. It may be, for instance, that Hotwire should have fought harder for its employee's interests—over and above the wishes of its client. But we do not "sit as a super-personnel department that reexamines an entity's business decisions." *Denney v. City of Albany*, 247 F.3d 1172, 1188 (11th Cir. 2001) (quoting *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991)). Instead, we interfere with an employer's decision to fire an employee *only* when the action is taken "for a discriminatory reason." *Chapman v. AI Transp.*, 229 F.3d 1012, 1030 (11th Cir. 2000) (en banc). And Fernandez has given us no reason to believe that she was removed from the account—and then terminated—for a *discriminatory* reason.

2020). During the walk-around, Lender "observed Hotwire equipment in obviously unacceptable condition." Def.'s SOF ¶ 18; Pl.'s SOF ¶ 18 (undisputed).

The parties agree that Harbour Oaks was poorly maintained. The question is: Whose fault was it? Fernandez admitted that, when Hotwire first assigned her to the property, she "did not do a walk through," Fernandez Depo. at 160:25, and "she did not look for any issues that may have existed concerning the installation of Hotwire's equipment on the outside of the Harbor Oaks property," Def.'s SOF ¶ 22; Pl.'s SOF ¶ 22 (failing to genuinely dispute this fact); *see also* Fernandez Depo. at 161:11–162:14 (conceding that she didn't look for outdoor issues). This, as we've said, was a *clear violation* of her job responsibilities as outlined in the Checklist she *herself* reviewed and signed. *See* Checklist at 261. Fernandez also doesn't deny the "big issue" she had with Harbour Oaks—*viz.*, that "the construction people . . . . [d]id not install correctly. Left wires hanging." Fernandez Depo. at 143:8–17 (errors in original). But she maintains "that [the improper installation] was not my job. That is the project manager's and the construction people. Not my job. Not my job." *Id.* at 143:11–13. At least sometimes. Earlier in her deposition, Fernandez agreed that her job as account manager *was* to ensure that "[a]ll the services were being done right, everything looked good, everything was installed right, everything was running perfectly." *Id.* at 142:13–16. And, in a later part of her deposition, when she was asked: "So, on Hotwire's end, it is you who is responsible for fixing problems, right?" she answered: "I mean—but, yeah." *Id.* at 153:5–7.

Fernandez conceded that Harbour Oaks "was always having issues, even way before me. It was always having issues. This property has issues, issues, issues." *Id.* at 152:8–12. She also admitted that "board members began to call [her] upset, telling [her] they were thinking of suing Hotwire." Fernandez Decl. ¶ 17. But Fernandez insists that she acquired the poorly maintained property from another account manager, Thania, who was herself "terminated for deficient work performance." *Id.* ¶ 14–15. "When it was given to me," Fernandez testified, "this property ha[d] a lot of problems."

6

Fernandez Depo. at 152:18–20. But she didn't do anything "to solve the problems," *id.* at 152:21, because they had "nothing to do with [her]," *id.* at 155:12, and they were "not [her] problem," *id.* at 155:17–18. Again, this testimony is directly contradicted by the Checklist she herself agreed to. *See* Checklist at 261.

When the COVID-19 pandemic began, Hotwire underwent "a complete restructuring of the entire company," Lender Depo. 45:19, and decided to "separate[ ] from employment with 34 out of its 1,102 employees." Def.'s SOF ¶ 34; Pl.'s SOF ¶ 34 (failing to genuinely dispute this fact). Lender was "supposed to get rid of eight of [the] maybe 50, 60 people" he oversaw. Lender Depo. at 45:23–46:2. So, Lender "basically rank[ed] them." *Id.* at 38:21. He "looked at each individual person, their properties, their performance and there was somethings [sic] going on specifically with [Fernandez] at that time that weren't going on with the others, so she stuck out." *Id.* at 39:2–6 (errors in original). By contrast, Lender had no "complaints" about any "other account manager[.]" *Id.* at 45:9–11. As Stephan remembered it, she and Lender "had been discussing [Fernandez's] performance since probably December of 2019 when we did our performance review that we do at the end of every year, and then we also had discussed her performance again in late January of 2020 when she had an issue at a property [Harbour Oaks]." Stephan Depo. at 19:3–8. Using the Checklist as her guide, Stephan ranked Fernandez "[her] lowest performer[.]" *Id.* at 18:18; *see also* Def.'s SOF ¶ 30; Pl.'s SOF ¶ 30 (failing to create a genuine dispute of material fact on this issue).

Here's why we think Fernandez has failed to create a genuine dispute of material fact on this issue. At summary judgment, Fernandez maintains that "Ms. Stephen [sic] did not conduct any evaluation and repeatedly expressed to Plaintiff that she was doing a good job." Pl.'s SOF ¶ 30. Again, however, these two assertions don't rebut Hotwire's proposed fact—at least not in a way that staves off summary judgment. Let's take the two halves of Fernandez's disputation in turn. The first half—that Stephan "did not conduct any evaluation"—we reject out of hand. That Fernandez wasn't *told*

about the evaluation isn't evidence that it wasn't *conducted*. *See Versfelt*, 2022 WL 479881, at *4 n.4 ("[T]here's no law that require[d] [the defendant] . . . to warn [the plaintiff] (or discipline him) before firing him[.]"). And Fernandez cannot credibly surmise that the evaluation "did not occur," because she would have no basis for knowing whether Stephan was (or was not) evaluating her. *See Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1253–54 (11th Cir. 2013) ("As a general principle, a plaintiff's testimony cannot be discounted on summary judgment unless . . . it relates to facts that could not have possibly been observed[.]"); *United States v. Flores*, 572 F.3d 1254, 1263 (11th Cir. 2009) (noting that testimony is incredible as a matter of law "if it relates to facts that the witness could not have possibly observed"). As we've said many times, we don't draw inferences that *aren't* based on the evidence. *See, e.g., Wills v. Walmart Assocs., Inc.*, 2022 WL 845183, at *7 n.6 (S.D. Fla. Mar. 22, 2022) (Altman, J.) ("[S]peculation isn't enough to survive summary judgment."), *appeal dismissed sub nom.*, 2022 WL 2821277 (11th Cir. June 17, 2022).

At the same time, we'll accept as genuine Fernandez's testimony that Stephan told her she was doing a "good job." Two problems with this, though: *One*, Fernandez doesn't tell us *when* Stephan said this. It thus may well be that Stephan told her she was doing a good job early on—*before* Fernandez's performance started to flag. *Two*, and more importantly, Stephan's attempts at encouraging a struggling employee[8] by telling her she's doing well *doesn't* rebut the undisputed facts we have in the record—all of which indicate that Fernandez was *failing* at her job, including: (1) that Fernandez failed to follow up with clients, *see* Stephan Depo. at 24:23–25:3; (2) that she improperly reported her mileage, *see id.* at 25:3–4; (3) that one client asked Hotwire to remove her from its account, *see* JSOF ¶ 14; (4) that the

---

[8] In her declaration, Fernandez didn't—as the Plaintiff's SOF would make it seem—simply say that Stephan told her she was "doing a good job." Instead, Fernandez said: "Shannon would tell me that I was doing a good job, and that it takes time. Shannon said it would take over a year to get the hang of it and that when you think you have everything good, you never know because everything changes with Hotwire." Fernandez Decl. ¶ 10. Fernandez's own framing, then, suggests that Stephan was encouraging and reassuring her subordinate.

board members of another client called and threatened to sue Hotwire because of her shoddy work, *see* Fernandez Decl. ¶ 17; and (5) that she failed to inspect Hotwire's equipment—and failed to report its poor condition—at Harbour Oaks, *see* Fernandez Depo. at 153:18–155:19, 160:25, 161:11–162:14. Standing alone, each of these uncontested failings was *probably* an adequate basis to terminate Fernandez. Taken together, though, they essentially dispose of this case.

Back to our overall story: Given Lender and Stephan's review of Fernandez's performance— and the state of the properties she managed—Hotwire fired her on April 3, 2020. *See* Fernandez Depo. at 91:19; *see also* Def.'s SOF ¶ 35; Pl.'s SOF ¶ 35 (failing to genuinely dispute this fact). Later that day, Stephan sent Fernandez some text messages, asking if she had "sp[oken] to HR." April 3 Text Message Exchange [ECF No. 55-5] at 1. When Fernandez responded that she "ha[d] not" and that "they just emailed me a termination," Stephan texted back that Fernandez's dismissal was "beyond unprofessional," adding that "[HR] didn't even call me they emailed me to call them I called them twice with no answer[.]" *Ibid.* "Honestly," Stephan wrote, "it's insane[.]" *Ibid.* On April 9, Lender wrote Fernandez the following email about her termination:

> Bianca,
>
> Thank you for taking the time to voice your concerns.
>
> Please know that many factors are considered before a decision is made to separate with an employee. After careful review, the decision to separate was made by your leadership team, not any member of HR. This decision was made for legitimate, non-discriminatory, business reasons.
>
> I was informed that HR attempted to reach you by telephone to communicate this information, but was unsuccessful in receiving a return call after repeated attempts. This is why it was necessary to send you the information via email. You will be receiving another email from HR with important information about your benefits as well as other details. Any future questions about those items should be sent to HR@hotwiremail.com or Benefits@hotwiremail.com.
>
> We wish you much success in your future endeavors.
>
> Carl

April 9 Email Exchange [ECF No. 55-2] at 70.

Fernandez now claims that she was "fired because [she was] replaced with somebody younger than [her]." Fernandez Depo. at 194:12–13. According to Fernandez, she was replaced by Rubi Garcia, who "began working as an Account Manager the first business day following [her] termination." Fernandez Decl. ¶ 25; *see also* Fernandez Depo. at 197:3–9. Garcia is "substantially younger" than Fernandez: Garcia was born in 1984, and Fernandez was born in 1976. Fernandez Decl. ¶ 27. And, because Garcia is male, Fernandez also asserts a claim of sex discrimination. *See* Fernandez Depo. at 91:12–14.

But, even according to Fernandez, "[Hotwire] had determined to reassign Rubi Garcia to the Account Management Group in December, 2019[.]" Response at 2; *see also* Def.'s SOF ¶ 45 ("Hotwire made the decision to transfer Rubi Garcia to the Account Manager position in December 2019, long-before [Fernandez's] termination, because Mr. Garcia was an extremely high-performing employee."). Garcia had been "a launch account manager" at Hotwire, Lender Depo. at 46:21, who had "applied for a promotion" to account manager, *id.* at 46:15. Fernandez claims that "[t]here was no testimony by Stephan that Garcia was 'an extremely valuable employee.' Nor was there any testimony as to why he was transferred." Pl.'s SOF ¶ 46. But there *was* testimony from Stephan that Garcia was transferred because "[he] was needed for the replacement of Thania, who was a previous account manager." Stephan Depo. at 16:7–8. And there was testimony from Lender that Garcia was promoted "because he's excellent." Lender Depo. at 46:6–16.

Anyway, on January 19, 2021, Fernandez filed this lawsuit, which she's since amended. *See* Am. Compl. [ECF No. 39]. In her now-operative Amended Complaint, Fernandez asserts one count of age discrimination under the Age Discrimination in Employment Act, 29 U.S.C. § 623 (the "ADEA"), and one count of sex discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* ("Title VII"). In each count, Fernandez claims both disparate treatment and

disparate impact. *See generally* Amended Compl. Hotwire has now moved for summary judgment on both counts. *See generally* MSJ.

## THE LAW

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). An issue of fact is "material" if it might affect the outcome of the case under the governing law. *Id.* at 248. A dispute about a material fact is "genuine" if the evidence could lead a reasonable jury to find for the non-moving party. *Id.* "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* at 252.

At summary judgment, the moving party bears the initial burden of "showing the absence of a genuine issue as to any material fact." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) ("[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."). Once the moving party satisfies its initial burden, the burden then shifts to the non-moving party to "come forward with specific facts showing there is a genuine issue for trial." *See Bailey v. Allgas, Inc.*, 284 F.3d 1237, 1243 (11th Cir. 2002) (emphasis omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

The Court, in ruling on a motion for summary judgment, "need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3); *see also HRCC,*

11

*Ltd. v. Hard Rock Cafe Int'l (USA), Inc.*, 703 F. App'x 814, 817 (11th Cir. 2017) (noting that a "court may decide a motion for summary judgment without undertaking an independent search of the record" (quoting Fed. R. Civ. P. 56 advisory committee's note)). In any event, on summary judgment, the Court must "review the facts and all reasonable inferences in the light most favorable to the non-moving party." *Pennington*, 261 F.3d at 1265.

In sum, then, if there are any genuine issues of material fact, the Court must deny summary judgment and proceed to trial. *Whelan v. Royal Caribbean Cruises Ltd.*, 2013 WL 5583970, at *2 (S.D. Fla. Aug. 14, 2013) (Ungaro, J.). On the other hand, the Court must grant summary judgment if a party "has failed to make a sufficient showing on an essential element of her case." *Celotex*, 477 U.S. at 323; *see also Lima v. Fla. Dep't of Children & Families*, 627 F. App'x 782, 785–86 (11th Cir. 2015) ("If no reasonable jury could return a verdict in favor of the nonmoving party, there is no genuine issue of material fact and summary judgment will be granted." (quoting *Beal v. Paramount Pictures Corp.*, 20 F.3d 454, 459 (11th Cir.1994))).

## ANALYSIS

"Title VII prohibits an employer from 'discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.'" *Schoenfeld v. Babbit*, 168 F.3d 1257, 1266 (11th Cir. 1999) (quoting 42 U.S.C. § 2000e-2(a)(1)). Similarly, "[t]he ADEA prohibits employers from discharging an employee who is at least 40 years of age because of that employee's age." *Sims v. MVM, Inc.*, 704 F.3d 1327, 1331 (11th Cir. 2013). Indeed, "[t]he language of the ADEA closely parallels that of Title VII." *Adams v. Fla. Power Corp.*, 255 F.3d 1322, 1324 (11th Cir. 2001). "In fact, the sections forbidding discrimination are almost identical." *Ibid.* (comparing the ADEA with Title VII). So, we'll analyze Fernandez's age- and sex-discrimination claims together.

"A Title VII action may be based upon disparate treatment or disparate impact or both."

*Eastland v. Tenn. Valley Auth.*, 704 F.2d 613, 618 (11th Cir. 1983), *reh'g denied and opinion modified*, 714 F.2d 1066 (11th Cir. 1983). And the same is true for the ADEA: "[A] plaintiff may advance an ADEA discrimination claim via disparate impact theory or disparate treatment theory." *Seff v. Bd. of Cnty. Comm'rs of Miami-Dade Cnty.*, 2019 WL 2542651, at *3 (S.D. Fla. June 20, 2019) (Cooke, J.) (citing *Smith v. City of Jackson, Miss.*, 544 U.S. 228, 232 (2005)). As we've said, Fernandez has asserted claims under both theories, so we'll address each in turn.

## I.        Disparate Treatment

"A plaintiff in a Title VII action may attempt to show discrimination by offering either direct or circumstantial evidence." *Schoenfeld*, 168 F.3d at 1266 (cleaned up). In much the same way, a plaintiff may "establish a claim of illegal age discrimination through either direct evidence or circumstantial evidence." *Mora v. Jackson Mem'l Found., Inc.*, 597 F.3d 1201, 1204 (11th Cir. 2010); *see also Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1358 (11th Cir. 1999) ("In proving an age discrimination claim, a plaintiff can establish a *prima facie* case of discrimination through either direct evidence of discrimination or . . . circumstantial evidence."). In both types of cases, the plaintiff "must establish that the employer *intended* to discriminate against the protected group." *Armstrong v. Flowers Hosp., Inc.*, 33 F.3d 1308, 1313 (11th Cir. 1994) (emphasis added); *see also Smith v. J. Smith Lanier & Co.*, 352 F.3d 1342, 1344 (11th Cir. 2003) (emphasis added) (explaining that an ADEA plaintiff must show "evidence by which a fact finder could reasonably conclude that the employer *intended* to discriminate on the basis of age in reaching that decision" (emphasis added)). Fernandez fails to offer either direct or circumstantial evidence of discrimination.

### A.  Direct Evidence

"Direct evidence is evidence which, if believed, proves the existence of the fact in issue without inference or presumption." *Jones v. Bessemer Carraway Med. Ctr.*, 151 F.3d 1321, 1323 n.11 (11th Cir. 1998); *see also Clark v. Coats & Clark, Inc.*, 990 F.2d 1217, 1223 (11th Cir. 1993) ("Evidence is direct

when it is sufficient to prove discrimination without inference or presumption."). Direct evidence, in

other words, is "powerful evidence capable of making out a prima facie case essentially by itself." *Jones*,

151 F.3d at 1323 n.11. "[O]nly the most blatant remarks, whose intent could be nothing other than to

discriminate on the protected classification are direct evidence of discrimination." *Wills*, 2022 WL

845183, at *24 (quoting *Scott v. Suncoast Beverage Sales, Ltd.*, 295 F.3d 1223, 1227 (11th Cir. 2002)). Direct

evidence would include, for instance, "a frank admission from a manager that he refused to hire an

applicant because he was black or because she was female." *Schweers v. Best Buy, Inc.*, 132 F. App'x 322,

324 (11th Cir. 2005) (quoting *Cooper v. S. Co.*, 390 F.3d 695, 724 n.15 (11th Cir. 2004)); *see also Earley v.

Champion Int'l Corp.*, 907 F.2d 1077, 1081 (11th Cir. 1990) ("One example of direct evidence would be

a management memorandum saying, 'Fire Earley—he is too old.'").

    Fernandez never argues that she's satisfied this rigorous standard, *see generally* Response—

which is reason enough to stop here, *see United States v. Campbell*, 26 F.4th 860, 873 (11th Cir. 2022) (en

banc) (holding that the "failure to raise an issue in an initial brief . . . should be treated as a forfeiture

of the issue, and therefore the issue may be raised by the court *sua sponte* [only] in extraordinary

circumstances"); *see also Hamilton v. Southland Christian Sch., Inc.*, 680 F.3d 1316, 1319 (11th Cir. 2012)

("[T]he failure to make arguments and cite authorities in support of an issue waives it."); *In re Egidi*,

571 F.3d 1156, 1163 (11th Cir. 2009) ("Arguments not properly presented in a party's initial brief or

raised for the first time in the reply brief are deemed waived.").

## B. Circumstantial Evidence

    Circumstantial evidence "*suggests*—but does not prove—a discriminatory motive." *Burrell v. Bd.

of Trs. of Ga. Mil. Coll.*, 125 F.3d 1390, 1393–94 (11th Cir. 1997); *see also Gonzalez v. Fla. Dep't of Mgmt.

Servs.*, 683 F. App'x 738, 742 (11th Cir. 2017) ("If the alleged statement suggests, but does not prove,

a discriminatory motive, then it is circumstantial evidence." (cleaned up)).

    "Discrimination claims brought under Title VII . . . are typically categorized as either mixed-

motive or single-motive claims." *Quigg v. Thomas Cnty. Sch. Dist.*, 814 F.3d 1227, 1235 (11th Cir. 2016). In a single-motive case—where the employee alleges that her sex was the *sole* factor behind the adverse action—"[a] plaintiff can establish intentional discrimination through circumstantial evidence in two ways." *Dukes v. Shelby Cnty. Bd. of Educ.*, 762 F. App'x 1007, 1011 (11th Cir. 2019). *First*, she may "satisfy[ ] the burden-shifting framework set out in *McDonnell Douglas.*" *Lewis v. City of Union City*, 918 F.3d 1213, 1220 (11th Cir. 2019) (en banc).[9] *Second*, she can "demonstrate a 'convincing mosaic' of circumstantial evidence that warrants an inference of intentional discrimination." *Lewis*, 918 F.3d at 1221 n.6 (quoting *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011)). By contrast, in mixed-motive cases—in which the employee says that her sex was one of *several* factors behind the adverse action—"[a]n employee challenging a decision made by a board can succeed . . . if she demonstrates that discriminatory input, such as sex or gender-based bias, *factored into the board's decisional process.*" *Quigg*, 814 F.3d at 1241 (emphasis added & cleaned up).

The analysis is very much the same under the ADEA. *See Dowlen v. Sec'y of Veterans Affs.*, 288 F. App'x 572, 578 (11th Cir. 2008) ("Where, as here, a plaintiff offers circumstantial evidence to prove a claim of discrimination under the ADEA, we use the analytical framework established by the Court in *McDonnell Douglas*[.]"); *see also Sims*, 704 F.3d at 1333 ("Although our *Kragor* decision and our holding today reaffirm the use of the *McDonnell Douglas* framework in ADEA cases, this framework is not the *sine qua non* for a plaintiff to survive summary judgment in a discrimination case. . . . A triable issue of fact exists if the record, viewed in a light most favorable to the plaintiff, presents a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker." (cleaned up)). The ADEA *does* add one wrinkle: The Supreme Court has held that the ADEA doesn't allow for mixed-motive claims because, "under the plain language of the [statute,] . . .

---

[9] The test takes its name from the Supreme Court's decision in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973).

a plaintiff must prove that age was the 'but-for' cause of the employer's adverse decision." *Gross v. FBL Fin. Servs. Inc.*, 557 U.S. 167, 176 (2009). That wrinkle doesn't affect us here, though, because Fernandez has elected to proceed *only* with a single-motive claim. *See* Response at 12 (citing *McDonnell Douglas* but not *Quigg* or its progeny); *see generally* Response (never deploying the language of mixed-motive claims or even citing any mixed-motive cases). We'll thus consider her sex- and age-discrimination claims under (1) the burden-shifting framework the Supreme Court outlined in *McDonnell Douglas* and (2) the "convincing mosaic" theory. As we're about to see, she fails both tests.

### i.  *McDonnell Douglas*

"*McDonnell Douglas* established a three-step process for analyzing discrimination claims[.]" *Ehrhardt v. Haddad Rest. Grp., Inc.*, 443 F. App'x 452, 455 (11th Cir. 2011). *First*, "the plaintiff must . . . offer evidence sufficient to establish a *prima facie* case of discrimination[.]" *Vira v. Crowley Liner Servs., Inc.*, 723 F. App'x 888, 892 (11th Cir. 2018). *Second*, "[o]nce a prima facie case is made, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action." *Ibid. Third*, "[i]f the employer meets its burden, the plaintiff must then show that the employer's stated reason is pretext for discrimination[.]" *Ibid.* We consider each step in turn.

### 1.  Prima-Facie Case: Sex Discrimination[10]

Under the first step of the *McDonnell Douglas* burden-shifting framework, the employee "bears the initial burden of establishing a *prima facie* case of discrimination by showing (1) that she belongs to a protected class, (2) that she was subjected to an adverse employment action, (3) that she was qualified to perform the job in question, and (4) that her employer treated 'similarly situated' employees outside her class more favorably." *Lewis*, 918 F.3d at 1220–21.

---

[10] We'll discuss Fernandez's ADEA prima-facie case in the next section because Fernandez asks us to review that claim under the separate reduction-in-force test that applies only to ADEA cases. *See* Response at 10.

Hotwire disputes only whether Fernandez has satisfied the fourth element of her prima-facie case. *See* MSJ at 5 ("Plaintiff cannot satisfy the fourth element of her discrimination claims because Hotwire treated all employees the same, regardless of their respective protected classes."). Nor could Hotwire have suggested otherwise—at least when it comes to the first two elements: Fernandez, after all, is a woman over the age of forty, and she was fired. In any case, we agree with Hotwire that Fernandez has failed to provide sufficient evidence for the fourth element of her prima-facie case.

"To meet the fourth prong, a comparator must be 'similarly situated in all material respects,' meaning that the plaintiff and comparators are 'sufficiently similar, in an objective sense, that they cannot reasonably be distinguished.'" *Earle v. Birmingham Bd. of Educ.*, 843 F. App'x 164, 166 (11th Cir. 2021) (quoting *Lewis*, 918 F.3d at 1228). A similarly-situated comparator "will ordinarily (1) have engaged in the same basic conduct as the plaintiff; (2) have been subject to the same employment policy, guideline, or rule as the plaintiff; (3) have been under the jurisdiction of the same supervisor as the plaintiff; (4) and share the plaintiff's employment history." *Ibid.* These considerations "leave[ ] employers the necessary breathing space to make appropriate business judgments." *Lewis*, 918 F.3d at 1227–28.

In her Amended Complaint, Fernandez identified Rubi Garcia as her similarly-situated comparator for her sex-discrimination claim. *See* Am. Compl. ¶ 41. But, at summary judgment, Fernandez seems to have abandoned this argument *entirely*—claiming, instead, that she doesn't need to find a comparator at all. *See* Response at 12–13 ("[A]s *Smith* recognized, plaintiff does not have to plead a comparator at all, even at summary judgment." (citing *Smith*, 644 F.3d at 1328)). And she's, in some respects, right about that. As we've said, a Title VII plaintiff *doesn't* need to identify a similarly-situated comparator *if* she *either* (1) has direct evidence of discrimination *or* (2) proceeds under a mosaic theory of discrimination. *See Smith*, 644 F.3d at 1328. But Fernandez has *no* direct evidence of discrimination—and, as we'll see in a moment, she's failed to establish even a hint of any

discriminatory mosaic. The point for now, though, is that, for purposes of her *McDonnell Douglas* claim, Fernandez has *forfeited* any argument she might've had that she's identified a similarly-situated comparator. *See, e.g.*, *Campbell*, 26 F.4th at 873 (holding that the "failure to raise an issue in an initial brief . . . should be treated as a forfeiture of the issue, and therefore the issue may be raised by the court *sua sponte* [only] in extraordinary circumstances"); *Hamilton*, 680 F.3d at 1319 ("[T]he failure to make arguments and cite authorities in support of an issue waives it."); *Case v. Eslinger*, 555 F.3d 1317, 1329 (11th Cir. 2009) ("A party cannot readily complain about the entry of a summary judgment order that did not consider an argument they chose not to develop for the district court at the time of the summary judgment motions."). That's sufficient for us to enter summary judgment against Fernandez on the *McDonnell Douglas* portion of her Title VII claim. *See Earle*, 843 F. App'x at 166 ("A plaintiff's failure to produce evidence showing that a single similarly situated employee was treated more favorably will preclude the establishment of a *prima facie* case." (cleaned up)).[11]

But here's the thing: Even if she hadn't forfeited the argument, her attempt to paint Garcia as her comparator would've failed for two independent reasons.

*First*, Fernandez fails to show that she and Garcia share the same employment history. And, at summary judgment, a plaintiff must produce *evidence* to support her contention that the comparator is, as the Eleventh Circuit requires, "similarly situated in all material respects." *Ibid.* (cleaned up); *see also Jones v. Unity Behav. Health, LLC*, 2021 WL 5495578, at *6 (11th Cir. Nov. 23, 2021) (finding no prima-facie case where "the *evidence* fails to show [the comparator] . . . had a similar history" (emphasis added & cleaned up)). Fernandez testified that Garcia "was a launch manager at Hotwire before he

---

[11] As we're about to see, there's a slight exception to the *McDonnell Douglas* test for reduction-in-force claims under the ADEA. So, technically, Fernandez could still make out a prima-facie ADEA (but not Title VII) case—even without a similarly-situated comparator—if she could satisfy the more-rigorous test courts have outlined for reduction-in-force claims. But Fernandez plainly fails the reduction-in-force test (more on this later), so we think it's fair to say that her unwillingness to identify a similarly-situated comparator here dooms her *McDonnell Douglas* claim under Title VII.

became an account manager[.]" Fernandez Depo. at 199:9–11. What she never says, however, is that *she* was ever a "launch manager," or that she and Garcia share any *other* similar employment history. *See generally* Response.

    *Second*, she produces absolutely no evidence that she and Garcia "engaged in the same basic conduct[.]" *Earle*, 843 F. App'x at 166; *see also, e.g.*, *Holmes v. City of Ft. Pierce*, 2022 WL 247976, at *6 (11th Cir. Jan. 27, 2022) (finding that the plaintiff failed to make out a prima-facie case because the "alleged comparators did not engage in the same basic misconduct"). She, in fact, tells us nothing about Garcia's performance at Hotwire. *See generally* Response. Indeed, the only evidence we have about Garcia's work at Hotwire is that he "applied for a promotion and he got it because he's excellent." Lender Depo. at 46:15–16. Fernandez never even tries to rebut this assertion. *See generally* Response. And, while she tries to parry Hotwire's complaints about *her* mismanagement of client properties, *see e.g.*, Response at 8 (blaming issues at her client sites on Hotwire's "fail[ure] to provide employees with any training or proper training"), and asserts that "there is no documentation of [ ] any performance issues," *ibid.*, she never defends herself against Hotwire's allegations that: (1) she failed to follow up with clients, *see* Stephan Depo. at 24:23–25:3; (2) she improperly reported her mileage, *see id.* at 25:3–4; (3) one of her assigned clients asked Hotwire to remove her from its account, *see* JSOF ¶ 14; (4) the board members of another client called and threatened to sue Hotwire because of her shoddy work, *see* Fernandez Decl. ¶ 17; and (5) she failed to inspect Hotwire's equipment—and failed to report its poor condition—at Harbour Oaks, *see* Fernandez Depo. at 153:18–155:19, 160:25, 161:11–162:14.[12] She also doesn't suggest that Garcia was ever accused of similar improprieties. *See*

---

[12] As we've said, Fernandez *does* dispute that she was ever *told* about issues with her performance— but she never *actually* disputes the allegations themselves. *See* Pl.'s SOF ¶¶ 10, 11 ("Ms. Stephan repeatedly expressed to Plaintiff that she was doing a good job.").

*generally* Response. Which is all in the way of saying: Fernandez has failed to show that she and Garcia were similarly situated.

Fernandez, in short, has failed to make out a prima-facie case of sex discrimination.[13]

### 2.  Reduction-in-Force: ADEA Claim

In a final, last-ditch effort to save her disparate-treatment claim *under the ADEA*,[14] Fernandez now argues that we should apply "the more stringent reduction-in-force test." *Regina v. Weiss Gifted & Talented Sch., Inc.*, 2021 WL 879520, at *8 (S.D. Fla. Mar. 9, 2021) (Altman, J.). The elements of a prima-facie case of age discrimination "are altered in cases involving [a reduction-in-force] and in those where a position is eliminated entirely." *Zaben v. Air Prods. & Chems., Inc.*, 129 F.3d 1453, 1457 (11th Cir. 1997). "In such cases, the plaintiff must show (1) that he was in a protected age group and was adversely affected by an employment decision, (2) that he was qualified for the position held at the time of discharge and (3) evidence by which a fact finder could reasonably conclude that the employer intended to discriminate on the basis of age in reaching that decision." *Ibid.* "The variant test alters the fourth prong of the *McDonnell Douglas* test, that a person outside the protected class replaced the plaintiff, because, in RIFs, employers rarely seek replacements for the discharged employee." *Mitchell v. City of LaFayette*, 504 F. App'x 867, 870 (11th Cir. 2013).

Fernandez asks us to apply this test *even though* she's proceeded throughout this litigation on the theory that she "was replaced at Hotwire by a younger man," Response at 17, and despite never having suggested that her position was eliminated entirely. She, in fact, continues to maintain that

---

[13] For all the reasons we've given, Fernandez has forfeited her *McDonnell Douglas* claim. But, if she hadn't, we would've been willing to assume that, only for purposes of her ADEA claim, she's made out a prima-face case. That's because, to prevail on an ADEA claim, a plaintiff need not identify a similarly-situated comparator. Instead, as we've highlighted (*see supra* note 11), under the ADEA, the fourth element requires a plaintiff to show that she "(4) was replaced by or otherwise lost a position to a younger individual." *Chapman*, 229 F.3d at 1024.

[14] The RIF test doesn't apply to Title VII claims.

Hotwire began advertising for an open account-manager position soon after she was terminated. *See id.* at 11. Still, Hotwire has always maintained that Fernandez was dismissed as part of a broader reduction-in-force. *See* MSJ at 3, 4, 12. So, we think it appropriate to give her the benefit of the doubt and analyze her claim under this test too.

Fernandez easily satisfies the first element—she's over the age of 40, and she was fired. The second element, though, is less straightforward. Although Fernandez spent five years at Hotwire, she had only been in her new position as account manager for a couple months when she was terminated. *See* JSOF ¶¶ 1, 2. So, she may not be entitled to the inference that she was qualified for her job. *See Damon*, 196 F.3d at 1360 ("Our precedent holds that if a plaintiff has enjoyed a long tenure at a certain position, we can infer that he or she is qualified to hold that particular position."). But, since Hotwire doesn't contest this element, *see* Reply at 4, we'll just assume that she *was* qualified.

Either way, she falters at the third element. To succeed at this final step, the Plaintiff must submit evidence "by which a fact finder reasonably could conclude that the employer intended to discriminate on the basis of age in reaching that decision." *Vaughan v. Morgan Stanley DW, Inc.*, 158 F. App'x 205, 207 (11th Cir. 2005). Either "statistical evidence or other evidence of a pattern of terminating older workers may be used to satisfy [this prong.]" *Ibid.*

Fernandez has submitted neither kind of evidence here. *See generally* Response. She advances no statistical evidence at all, identifies no pattern of terminating older employees, and never suggests that Hotwire nefariously relies, in its termination decisions, on some proxy for age. *Ibid.* Nor does she claim that Lender or Stephan ever made any derogatory comments about her—age-related or otherwise. *Ibid.* Instead, she repeatedly claims that she was only ever told she was "doing a good job." Fernandez Decl. ¶ 20. Without any "statistical evidence or other evidence of a pattern of terminating older workers," we're left only with this: (1) the Plaintiff is over 40 years old; (2) she was qualified to

do her job; and yet (3) she was fired. This combination of facts is insufficient to satisfy the reduction-in-force test. As the Eleventh Circuit has explained:

> [T]he plaintiff must produce *some evidence* that the employer did not treat him neutrally with respect to his age, but, instead, discriminated based upon it. The evidence must lead the factfinder to reasonably conclude either that the employer *consciously* refused to consider retraining or relocating the plaintiff due to his protected-class membership, or that the employer *considered* his protected-class membership as a negative factor in that consideration.

*Mitchell*, 504 F. App'x at 870 (emphasis added & cleaned up). Since Fernandez has adduced *no* evidence of *conscious* refusal or improper *consideration*, she's failed to make out a prima-facie case of age discrimination under the RIF test.

### 3.   Legitimate, Non-Discriminatory Reasons

If a plaintiff succeeds in making out a prima-facie case, "the burden then shifts to the employer to produce a legitimate, nondiscriminatory reason for the action taken against the plaintiff." *Flowers v. Troup Cnty., Ga., Sch. Dist.*, 803 F.3d 1327, 1336 (11th Cir. 2015) (cleaned up). Here, even if Fernandez *had* made out a prima-facie case, Hotwire would've satisfied its burden of proffering legitimate, non-discriminatory reasons for terminating her. "The defendant's burden is one of production, not persuasion, and is 'exceedingly light.'" *Cotton v. Enmarket Inc.*, 809 F. App'x 723, 725 (11th Cir. 2020) (quoting *Smith v. Horner*, 839 F.2d 1530, 1537 (11th Cir. 1988)).

Hotwire contends that it included Fernandez "in the COVID-19 reduction in force" because of her "performance issues." MSJ at 12. According to Hotwire, Fernandez "repeatedly failed to follow up on action items and to document her meetings as required," Def.'s SOF ¶ 10; a client requested that she "be removed from handling their account," *id.* ¶ 14; she "was unfamiliar with the poor condition of Hotwire's equipment located on the outside of Harbour Oaks," because she "had not been monitoring the condition of Hotwire's equipment," *id.* ¶¶ 20–21; she hadn't "previously conducted a walkthrough of the Harbour Oaks property," *id.* ¶ 19; and she "was not aware" of her basic managerial responsibilities, *id.* ¶ 23.

Unsurprisingly, poor job performance is a legitimate, non-discriminatory reason for firing an employee. *See, e.g., Jarvis v. Siemens Med. Sols. USA, Inc.*, 460 F. App'x 851, 856 (11th Cir. 2012) ("In this case, Siemens proffered three legitimate, non-discriminatory reasons for terminating Jarvis: (1) poor job performance, (2) insubordination, and (3) the knowing falsification of his timecard."); *Tolbert v. Briggs & Stratton, Corp.*, 256 F. App'x 340, 342 (11th Cir. 2007) (finding that "poor job performance" was a "non-discriminatory reason" for firing the employee); *Wills*, 2022 WL 845183, at *19 ("These [performance issues] are (we think it should go without saying) more than sufficient to meet [the Defendant]'s burden of production."); *Versfelt*, 2022 WL 479881, at *14 ("These [performance issues] are sufficient to satisfy [the Defendant]'s burden of production.").

Hotwire, then, has satisfied its burden of offering legitimate, non-discriminatory reasons for Fernandez's dismissal.

### 4. Pretext

Fernandez attempts to overcome Hotwire's legitimate reasons by advancing nine arguments that (she claims) indicate pretext. *See* Response at 16–17. But no reasonable jury could find that Hotwire's grounds for terminating Fernandez were pretextual.

"To avoid summary judgment the plaintiff must introduce significantly probative evidence showing that the asserted reason is merely a pretext for discrimination." *Brooks v. Cnty. Comm'n of Jefferson Cnty.*, 446 F.3d 1160, 1163 (11th Cir. 2006) (cleaned up) (quoting *Clark*, 990 F.2d at 1228). "A reason is not pretext for discrimination 'unless it is shown *both* that the reason was false, *and* that discrimination was the real reason.'" *Ibid.* (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993)). "To show that the employer's reasons were pretextual, the plaintiff must demonstrate 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence.'" *Cooper*, 390 F.3d at 725 (quoting *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir.

1997); *see also Crawford v. City of Fairburn*, 482 F.3d 1305, 1308 (11th Cir. 2007) ("The plaintiff must meet the reason proffered head on and rebut it." (cleaned up)). "If the plaintiff does not proffer sufficient evidence to create a genuine issue of material fact regarding whether each of the defendant employer's articulated reasons is pretextual, the employer is entitled to summary judgment on the plaintiff's claim." *Chapman*, 229 F.3d at 1024–25.

*First*, Fernandez argues that, at the outset of the pandemic, Hotwire applied for a Paycheck Protection Program ("PPP") Loan, "which required the retention or quick rehire of workers." Response at 16. According to Fernandez, "at least three workers were not rehired or given written offers of rehire," and "[a]ll of them were over forty." *Ibid.* This argument fails to rebut Hotwire's position that it fired Fernandez because of her poor performance. Fernandez surmises that "the failure to offer reinstatement in writing could cost Hotwire up to ten million dollars," and that [Hotwire's] "conduct seems to be deliberately indifferent to governmental regulations." *Id.* at 4. Perhaps (Fernandez posits) Hotwire just wanted to fire its older employees—like herself, "Victor Rosa, and Wayne Leonard"—even if it meant foregoing millions of dollars in reimbursement incentives. *Id.* at 3. But this is all just baseless speculation. Fernandez gives us no evidence for any of these assertions and certainly never ties any missed reimbursement checks to Hotwire's supposed desire to get rid of employees over 40. And it's not at all clear that the PPP loan even required Hotwire to rehire its terminated workers anyway. *See* Reply at 1–2 ("[T]he PPP Loan was repaid with interest, not forgiven as Plaintiff argues. . . . Plaintiff fails to cite any authority for her claim that obtaining loan forgiveness required her rehire because there is no such authority."); Decl. of G. Ware Cornell [ECF No. 58-4] ¶ 19 (stating that the present status of the loan is "forgiven or repaid"). Fernandez never rebuts either of these assertions with competent evidence. And her unsupported speculation about what the terms of the company's PPP loans were isn't enough to withstand summary judgment. *See Cendan v. Sch. Bd. of Broward Cnty., Fla.*, 2022 WL 4131105, at *10 (S.D. Fla. Sept. 12, 2022) (Altman, J.) ("[U]nsupported

24

speculation does not meet a party's burden of producing some defense to a summary judgment motion. Speculation does not create a genuine issue of fact; instead, it creates a false issue, the demolition of which is a primary goal of summary judgment." (citing *Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005) (cleaned up))); *Harrell*, 2022 WL 898565, at \*16 (same); *Wills*, 2022 WL 845183, at \*22 (same); *Versfelt*, 2022 WL 479881, at \*17 (same); *A&E Adventures LLC v. Intercard, Inc.*, 529 F. Supp. 3d 1333, 1345 (S.D. Fla. 2021) (Altman, J.) ("While the plaintiff need not calculate these damages with 'mathematical precision,' he may not advance a damages case that's based only on 'speculation or guesswork.'" (cleaned up)); *Alfonso*, 2021 WL 430720, at \*21 ("[A] jury cannot be allowed to engage in a degree of speculation and conjecture that renders its finding a guess or mere possibility. Such an inference is infirm because it is not based on the evidence.").

*Second*, according to Fernandez, Hotwire's reasons *must* be pretextual because "Stephan . . . had already interviewed Rubi Garcia during the fall of 2019 for the Account Manager position." Response at 16. We're *really* not sure what this has to do with Hotwire's decision to fire *her*. Perhaps Fernandez is speculating that she was fired to make room for Garcia. And maybe she's surmising that Hotwire used the COVID-19 pandemic as a pretext for her termination. We're guessing here because she never connects the dots in her briefing. And it simply isn't our job to make the Plaintiff's arguments for her. *See Solutia, Inc. v. McWane, Inc.*, 672 F.3d 1230, 1239 (11th Cir. 2012) ("There is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment. Rather, the onus is upon the parties to formulate arguments[.]"); *see also United States v. Caesar*, 2019 WL 6727504, at \*7 (S.D. Fla. Dec. 11, 2019) (Altman, J.) ("[T]he Court is not obligated to divine the parties' arguments for them."). In any event, even if Hotwire *did* use the COVID-19 pandemic as a pretext to replace Fernandez with Garcia, Fernandez's claim would still fail. Garcia, after all, was promoted "because he's excellent." Lender Depo. at 46:15–16. And, whether she was told this or not, Fernandez agrees that she very much *wasn't* excellent at her job. *See, e.g.*, Fernandez

Decl. ¶ 17 ("[B]oard members began to call me upset, telling me they were thinking of suing Hotwire."); JSOF ¶ 14 ("[T]he association president for the Club of Indian Lakes directly contacted [Lender] to request that [Fernandez] be removed from handling their account."); Def.'s SOF ¶ 18 ("Lender observed Hotwire equipment in obviously unacceptable condition."); Pl.'s SOF ¶ 18 (Undisputed); Fernandez Depo. at 152:10–12 (admitting there were significant issues at Harbour Oaks); Fernandez Depo. at 153:18–155:19 (admitting she never told anyone about the problems at Harbour Oaks); Fernandez Depo. at 160:25 (admitting she "did not do a walk through"); Fernandez Depo. at 161:11–162:14 (admitting she never inspected Hotwire's outdoor equipment). We're not prepared to say that a company cannot replace a poor employee with an excellent one *solely* because the poor employee happens to be a woman over 40.

*Third*, Fernandez says that Hotwire "presented no documentation of the performance of the Plaintiff." Response at 16; *see also id.* at 13 ("Hotwire cannot even identify, with any sort of specificity the standard it used to rank employees ('performance'), much less provide the results[.]"); *id.* at 17 (noting the "lack of any documented review"). But "[t]he employer may rely on subjective evaluations as long as the employer provides 'a clear and reasonably specific factual basis' for those evaluations." *Rodriguez v. Sec'y, U.S. Dep't of Homeland Sec.*, 608 F. App'x 717, 720 (11th Cir. 2015) (citing *Chapman*, 229 F.3d at 1034). And Hotwire *has* given us a clear explanation of the inputs it used to assess its employees' performance. *See* Stephan Depo at 23:18–20 (explaining that "the [Checklist] is what I heavily rely on because those are just the basic responsibilities of an account manager"); Lender Depo at 39:15–20 (explaining "the things going on [in Fernandez's performance] that influenced [his] decision," like the problems at Harbour Oaks). It's also not like Fernandez was close to making the grade: Of all the employees Stephan oversaw (at least 13 people, *see* Lender Depo. at 56:11–15) Fernandez came in dead last, *see* Stephan Depo. at 18:17–19 ("Carl asked me who my -- would be my lowest performer was, and I told him it was Bianca.").

Fernandez also points to "evidence that she was qualified for the position," which (she says) should be "juxtaposed with Defendant's failure to document any so called 'performance concerns.'" Response at 10. This evidence consists mainly (1) of her own testimony that her bosses regularly told her "she was doing a 'good job,'" and (2) her record as "a five-year employee who had no previous discipline." *Id.* at 11. But none of this evidence establishes that Hotwire fired her because she was a woman—or because she was over 40. While we accept Fernandez's testimony that she only received positive feedback from Stephan, her claim that "she was qualified for the position," and that the poor state of her properties wasn't her fault, is belied by *undisputed* record evidence. So, for instance, the requirements of the account-manager position were clearly laid out in her Job Description Flyer, which explained that "[account managers] are responsible for the overall good 'health' of the property." Job Description Flyer [ECF No. 55-1] at 249. And Fernandez doesn't dispute that her properties were in very *bad* shape. *See* Fernandez Depo. at 150:11–12 ("[T]here was [sic] so many problems"); *id.* at 152:8– 12 ("This property has issues, issues, issues."); Def.'s SOF ¶ 18 (noting that, during the walk-through at Harbour Oaks, Lender "observed Hotwire equipment in obviously unacceptable condition"); Pl.'s SOF ¶ 18 (Undisputed). Fernandez also signed the Checklist, which outlined her duties to "[i]nspect HE [Hotwire Equipment], Access Points, Common Area equipment on site to ensure quality control," and explained that she must "[b]e able to speak to where Hotwire's infrastructure lies within the community and the surrounding areas[.]" Checklist at 261. When Lender visited her at Harbour Oaks, however, she hadn't a clue as to the equipment or infrastructure—a reality that (again) she doesn't dispute. *See* Fernandez Depo at 147:6 ("I had no idea about it"); *see also* Lender Depo. at 40:21–24 (when Lender asked Fernandez to go "see, you know, the network [ ] she was kind of taken aback by that and I can tell that she didn't really know what we were going to do"); *id.* at 41:1–3 ("[Fernandez] actually told me -- that she doesn't do that. You know, she hadn't walked the property. She doesn't walk the property."). While we generally accept a plaintiff's self-serving testimony at summary

27

judgment, we may disregard self-serving testimony that is "blatantly contradicted by the record[ ] or blatantly inconsistent[.]" *Feliciano*, 707 F.3d at 1253; *see also Scott v.  Harris*, 550 U.S 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."); *Schultz v. Am. Airlines, Inc.*, 449 F. Supp. 3d 1301, 1311 (S.D. Fla. 2020) (Altman, J.), *aff'd*, 855 F. App'x 656 (11th Cir. 2021) ("And, while a plaintiff's testimony may not ordinarily be discounted at summary judgment, the Court may disregard self-serving testimony that is blatantly contradicted by the record, blatantly inconsistent, or incredible as a matter of law, meaning that it relates to facts that could not have possibly been observed[.]" (cleaned up)).

*Fourth*, Fernandez thinks she's found a material inconsistency between Lender and Stephan's accounts of her termination. In his post-termination email to Fernandez, Lender was clear that she had received "a careful review" before she was fired. April 9 Email Exchange at 70. At the same time, Stephan testified that "the entire process took 'ten to twenty minutes.'" Response at 16–17 (citing Stephan Depo. at 18:25). Of course, this is no contradiction at all. For one thing, Fernandez gives us no reason to believe that an employer cannot give an employee "careful review" in twenty minutes. For another, the unrebutted evidence is clear that Lender and Stephan had met long before the twenty-minute termination meeting to discuss Fernandez's lagging performance, that over the course of some months they had assessed their employees on a wide range of factors, and that Fernandez's results had come in dead last. *See* Stephan Depo. at 19:3–8 (testifying that she and Lender "had been discussing [Fernandez's] performance since probably December of 2019 when we did our performance review that we do at the end of every year, and then we also had discussed her performance again in late January of 2020 when she had an issue at a property [Harbour Oaks]"); *id.* at 18:18 (adding that, after applying Fernandez's performance to the requirements outlined in the Checklist, Fernandez came in

as "[Stephan's] lowest performer").

*Fifth*, Fernandez says that Stephan and Lender were inconsistent in their testimony about *who* was responsible for training her. *See* Response at 17 ("Stephan also testified that because she had 140 properties, she had no time to confirm the proper training of her Account Managers. However, Lender testified that training of the employees was Shannon Stephan's responsibility." (cleaned up)).[15] But this dispute—though it perhaps shows that Hotwire was poorly managed or that Stephan herself wasn't a competent supervisor—isn't material to the only salient question we have here, which is whether Hotwire fired Fernandez *because* of her age or *because* of her sex. It may be, in other words, that Stephan failed to train Fernandez properly. And she's right that, perhaps, this suggests that Hotwire doesn't do a great job by its employees. But that doesn't mean Fernandez was an exemplary employee, it doesn't establish that Garcia was anything but "excellent," and it certainly doesn't show that Fernandez was fired for a *discriminatory* reason. Remember, "[a] reason is not pretext for discrimination 'unless it is shown *both* that the reason was false, *and* that discrimination was the real reason.'" *Brooks*, 446 F.3d at 1163 (emphasis added) (quoting *Hicks*, 509 U.S. at 515). Again, we do not "sit as a super-personnel department that reexamines an entity's business decisions." *Denney*, 247 F.3d at 1188 (cleaned up); *Chapman*, 229 F.3d at 1030 ("An employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason." (cleaned up)).

*Sixth*, Fernandez asserts that her performance wasn't deficient because "Stephan testified that it was the Construction Department's responsibility to correct the deficiencies of the Harbour Oaks project[.]" Response at 17. Both parties agree that the construction department was responsible for

---

[15] As we've said, Fernandez's own deposition contradicts her assertion that Stephan failed to train her. Fernandez Depo. at 138:17–19 ("[Stephan] was out with me—you know, training. She did a lot of things with me.").

*physically* fixing the issues at Harbour Oaks. *See* Reply at 9 (agreeing that it was the construction department's responsibility to correct the deficient installation). But the Checklist Fernandez *herself* reviewed and signed unambiguously shows that Fernandez was responsible for "inspect[ing] [Hotwire Equipment], Access points, Common area equipment on site to ensure quality control," and "escalating to senior management any known property issue[.]" Checklist at 261. And Fernandez admitted at her deposition that she *never* inspected the equipment at Harbour Oaks, and that, before her walk-through with Lender, she *never* told anyone in the construction department (or at Hotwire) about the issues she was having with Harbour Oaks. *See* Fernandez Depo. at 153:18–155:19, 160:25, 161:11–162:14. She thus didn't do her job as required—and that's reason enough to fire her.

  *Seventh*, Fernandez insists that Hotwire's witnesses are "unworthy of credence." Response at 16. Specifically, Stephan's "testimony is false," she says, because "Stephan professed shock when Bianca Fernandez was fired on April 3, 2020 and sent Fernandez a text message which stated '[t]hey didn't even call me . . . honestly, it's insane,'" even though "Stephan testified in her deposition that she and Lender made the decision to terminate her." Response at 17. Again, however, there's no inconsistency here. The text messages don't suggest that Stephan was "shocked" by the *decision* to fire Fernandez. They show only that Stephan was surprised by the *means* and *timing* of the dismissal—which, apparently, happened by email (rather than by phone) and without notifying Stephan *in advance* that it was coming. *See generally* Apr. 3 Text Message Exchange. Indeed, the exchange starts with a text from Stephan, asking Fernandez: "Did you speak to Hr[?]" *Ibid.* This opening message indicates that Stephan suspected HR would be calling—which makes because, as Stephan testified, she and Lender had decided to fire her.

  But, even if we assume that Stephan was feigning ignorance about Fernandez's dismissal, we'd still find that Fernandez had failed to show pretext. That's because Stephan's in-the-moment dissembling about her involvement in Fernandez's termination doesn't suggest that Lender and

Stephan fired her *because* she's a woman or *because* she's over 40. *See* 29 U.S.C. § 623 (prohibiting employment decision "because of" age); 42 U.S.C. § 2000e (prohibiting employment decision "on the basis of" sex); *see also Blake v. Batmasian*, 318 F.R.D. 698, 701 (S.D. Fla. 2017) (Marra, J.) ("An allegation is immaterial if it has no value in developing the issues of the case."). Recall, in this respect, that "[a] reason is not pretext for discrimination 'unless it is shown *both* that the reason was false, *and* that discrimination was the real reason.'" *Brooks*, 446 F.3d at 1163 (emphasis added) (quoting *Hicks*, 509 U.S. at 515).

*Eighth*, Fernandez says that Stephan's testimony *must* be false because "[Stephan] had been told by Lender of Wayne Leonard's termination[.]" Response at 17. This (Fernandez insists) creates the inference "that [Stephan] was not part of the decision to terminate Bianca Fernandez, and did not know it was coming[.]" *Ibid*. But one thing has nothing to do with the other. That Stephan wasn't involved in Leonard's termination doesn't establish that Stephan and Lender were lying when they said that, unlike with Leonard, Stephan *was* involved in the decision to fire Fernandez.

*Ninth*, Fernandez points (again) to Hotwire's "omission of the material fact that Hotwire had applied for a ten-million-dollar PPP grant which required it to quickly rehire laid off workers." Response at 17. As with Fernandez's first argument, though, we're not sure why the PPP loan is relevant to Hotwire's legitimate reasons for firing her. And Fernandez doesn't tell us why it would be. In any event, Hotwire has shown that, while it dismissed Fernandez (in part) "due to unprecedented economic uncertainty caused by . . .COVID-19," MSJ at 1, it fired her principally because of her "performance deficiencies," *id.* at 7. Again, then, Fernandez's PPP contentions do nothing to establish that these legitimate reasons were pretextual.

Time and again, the Eleventh Circuit has reminded us that "[a]n employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason." *Chapman*, 229 F.3d at 1030 (cleaned up). And

we cannot say that the reasons Hotwire has proffered for firing Fernandez—her performance issues coupled with the unprecedented pandemic downturn—are simply a pretext for discrimination. To show that Hotwire's reasons were pretextual, Fernandez "must meet the reason proffered head on and rebut it." *Crawford*, 482 F.3d at 1308. She hasn't done that. Her opposition brief principally hovers around the margins—focusing on, for instance, whether Hotwire sought PPP funding, whether she was told she was doing a bad job, whether her poor performance was her employer's fault, whether her employer reviewed her performance for twenty minutes or more, whether Stephan was "shocked" be her dismissal, etc. etc.  But she never *actually* defends herself "head on" against Hotwire's four main assertions (all of which Hotwire has supported with competent proof): (1) that she failed to follow up with clients, *see* Stephan Depo. at 24:23–25:3; (2) that she improperly reported her mileage, *see id.* at 25:3–4; (3) that one client asked Hotwire to remove her from its account, *see* JSOF ¶ 14; and (4) that she failed to inspect Hotwire's equipment—and failed to report its poor condition—at Harbour Oaks, *see* Fernandez Depo. at 153:18–155:19, 160:25, 161:11–162:14. And we certainly have no reason to believe that, even if all of these *were* false, discrimination was the *real* reason for her dismissal. *See Brooks*, 446 F.3d at 1163 ("A reason is not pretext for discrimination 'unless it is shown *both* that the reason was false, *and* that discrimination was the real reason.'" (quoting *Hicks*, 509 U.S. at 515 (emphasis added))). Fernandez has thus failed to meet her burden under *McDonnell Douglas*.

### ii.  Convincing Mosaic

As we've explained, Fernandez's principal contention is that the evidence establishes a mosaic of discrimination. *See* Response at 12–13 (failing to rebut the Defendant's arguments that her comparators were insufficient, arguing that comparators aren't required at summary judgment, and citing the mosaic theory). [16]

---

[16] Although she quotes *Smith*'s "convincing mosaic" test in her Response (at 12), Fernandez never actually applies that test in her brief—placing us in the unenviable position of having to guess at her

"As an alternative to the *McDonnell Douglas* burden-shifting test, a plaintiff can survive summary judgment by presenting circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent." *Holley v. Ga. Dep't of Corr.*, 845 F. App'x 886, 890 (11th Cir. 2021). "A triable issue of fact exists if the record, viewed in a light most favorable to the plaintiff, presents a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker." *Smith*, 644 F.3d at 1328 (cleaned up). A convincing mosaic "may be shown by evidence that demonstrates, among other things, (1) suspicious timing, ambiguous statements, and other bits and pieces from which an inference of discriminatory intent might be drawn, (2) systematically better treatment of similarly situated employees, and (3) that the employer's justification is pretextual." *Lewis*, 934 F.3d at 1185 (cleaned up). We'll give Fernandez the first one— that there was "suspicious timing"—because she's alleged that "Garcia began working as an Account Manager the first business day following my termination." Fernandez Decl. ¶ 25.[17] Still, she plainly fails the second and third elements.

Starting with the second, Fernandez proffers absolutely no evidence of "systematically better treatment of similarly situated employees." *See generally* Response. She claims that Hotwire "terminate[d] the employment of not only Ms. Fernandez, but also Mr. Rosa and Mr. Leonard." *Id.* at 14. But, as we explain in more detail below, the dismissal of *three* older employees (in a company with over 1,000 workers) doesn't, standing alone, support Fernandez's view that Hotwire was "systematically" eliminating workers over 40. It also goes without saying that the firing of three older

---

intentions. We'll do our best to predict what she had in mind. But (given the lack of analysis) we'd probably be warranted in finding that she's forfeited this whole issue also. *See Hamilton*, 680 F.3d at 1319 ("[T]he failure *to make arguments* and cite authorities in support of an issue waives it." (emphasis added)); *Campbell*, 26 F.4th at 873 (holding that the "failure to raise an issue in an initial brief . . . should be treated as a forfeiture of the issue, and therefore the issue may be raised by the court *sua sponte* [only] in extraordinary circumstances").

[17] Looking to the rest of this first factor, though, Fernandez cites no ambiguous statements or any *other* evidence that could be construed as proof of discriminatory intent.

employees—one of whom was a man—doesn't indicate that Hotwire was "systematically" treating women worse than men.

As for the third element, as we've explained, Fernandez hasn't shown that Hotwire's reasons for firing her were pretextual. Fernandez has thus failed to allege a "convincing mosaic of circumstantial evidence."

\* \* \*

We therefore **GRANT** Hotwire's Motion for Summary Judgment as to Fernandez's claims of disparate treatment under both the ADEA and Title VII.

## II.    Disparate Impact

Fernandez alleged (in her Amended Complaint) that Hotwire's hiring policies have a disparate impact on women and older workers. *See* Am. Compl. ¶ 46 ("HOTWIRE's rehiring policy disproportionately impacts older workers and violates the ADEA[.]"); *id.* ¶ 52 ("HOTWIRE's policies disproportionately impact women and violates Title VII[.]"). But she completely fails to produce any evidence of disparate impact in her summary-judgment briefing. Indeed, she never advances a single disparate-impact argument, never cites a single disparate-impact case, and never even uses the phrase "disparate impact" in her Response. *See generally* Response. She's thus abandoned her disparate-impact claim. *See Hamilton*, 680 F.3d at 1319 ("[T]he failure to make arguments and cite authorities in support of an issue waives it."); *Case*, 555 F.3d at 1329 ("A party cannot readily complain about the entry of a summary judgment order that did not consider an argument they chose not to develop for the district court at the time of the summary judgment motions."); *Campbell*, 26 F.4th at 873 (holding that the "failure to raise an issue in an initial brief . . . should be treated as a forfeiture of the issue, and therefore the issue may be raised by the court *sua sponte* [only] in extraordinary circumstances").

Even if she hadn't forfeited this claim, though, it would've failed.

"A disparate impact claim requires the identification of a specific, facially-neutral, employment

practice causally responsible for an identified statistical disparity." *E.E.O.C. v. Joe's Stone Crab, Inc.*, 220 F.3d 1263, 1268 (11th Cir. 2000). As we've said, both Title VII and the ADEA "authorize recovery on a disparate-impact theory." *Smith*, 544 U.S. at 240. So, again, we'll analyze Fernandez's age- and sex-discrimination claims together.[18] A plaintiff in a sex-discrimination disparate-impact case "must establish three elements: *first*, that there is a significant statistical disparity between the proportion of women in the available labor pool and the proportion of women hired; *second*, that there is a specific, facially-neutral, employment practice which is the alleged cause of the disparity; and *finally*, and most critically in this case, that a causal nexus exists between the specific employment practice identified and the statistical disparity shown." *Joe's Stone Crab*, 220 F.3d at 1274; *see also Cardelle v. Miami Beach Fraternal Ord. of Police*, 593 F. App'x. 898, 901 (11th Cir. 2014) ("Discrimination based on disparate impact requires a plaintiff to show: 1) there is a significant statistical disparity among members of different age groups; 2) there is a specific, facially-neutral employment policy or practice; and 3) there is a causal nexus between the specific policy or practice and the statistical disparity." (cleaned up)). "Once each of these three elements are shown, a plaintiff has established a prima facie case of disparate impact discrimination." *Joe's Stone Crab*, 220 F.3d at 1275.

---

[18] The Supreme Court has noted that "[t]wo textual differences between the ADEA and Title VII make clear that the disparate-impact theory's scope is narrower under the ADEA than under Title VII." *Smith*, 544 U.S. at 228. *First*, the "reasonable factors other than age" provision of § 623(f)(1) precludes employer liability in disparate-impact cases "if the adverse impact was attributable to a nonage factor that was 'reasonable.'" *Id.* at 239. *Second*, unlike what it did with Title VII, Congress elected not to amend the ADEA to abrogate the Supreme Court's holding in *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642 (1989). In that case, the Court had said that "it is not enough to simply allege that there is a disparate impact on workers, or point to a generalized policy that leads to such an impact. Rather, the employee is responsible for isolating and identifying the specific employment practices that are allegedly responsible for any observed statistical disparities." *Smith*, 544 U.S. at 241 (cleaned up). Congress responded to *Wards Cove* by "expanding the scope of [Title VII]," Civil Rights Act of 1991, § 2, 105 Stat. 1071—but not the ADEA. The *Smith* Court interpreted this congressional silence as further evidence that the ADEA's scope hadn't been similarly expanded. Since Fernandez has presented no argument—much less evidence—of a disparate impact, this distinction between ADEA and Title VII claims is neither here nor there.

As we've said, Fernandez makes no argument about disparate impact. Nor could she. Looking through the record, the only potential evidence of disparate impact we could find is Fernandez's assertion that "at least three of the supposedly laid off workers at Hotwire, all in the chain of command of Carl Lender, all well over forty, all laid off on April 3, 2020, were never offered reinstatement[.]" Response at 2; *see also* Wayne Leonard Affidavit [ECF No. 58-2]; Victor Rosa Affidavit [ECF No. 58-3]. As a threshold matter, this evidence tells us nothing about any disparate impact on *women*—since one of the three terminated employees was a man. So, Fernandez's Title VII disparate-impact claim ends here. And her ADEA claim fails for two reasons.

*First*, she's "offered no statistical evidence or analysis in support." *Seff*, 2019 WL 2542651, at *4; *see also Adams v. Lucent Techs., Inc.*, 284 F. App'x 296, 304 (6th Cir. 2008) ("Because the plaintiffs have presented no such statistical evidence, they have not established a prima facie case of disparate impact discrimination."). And the law is clear that, "without statistical proof, disparate impact is not established." *Cardelle*, 593 F. App'x at 902.

*Second*, we have no evidence that Hotwire rehired *any* of the 34 terminated employees. *See* Response at 3 ("[W]e do not know whether anyone was given a written offer of rehire[.]"). So, Fernandez cannot show that Hotwire had a rehiring *policy* at all—meaning that she hasn't "identif[ied] the specific employment practice that allegedly has a disproportionate impact." *Armstrong*, 33 F.3d at 1314.

In other words, not only did Fernandez forfeit her disparate-impact claim—but she would've failed to make out a prima-facie case even if she'd tried. In the interest of completeness, though, we'll add one additional point, which is that "the little statistical evidence that exists in the record belies [the plaintiff's] disparate impact claim." *Lans v. Fla. Hwy. Patrol*, 2000 WL 1161916, at *6 (S.D. Fla. July 10, 2000) (Jordan, J.). To support its argument that its "reduction in force at the outset of the COVID-19 pandemic did not have a disparate impact on any protected class," MSJ at 3, Hotwire offers an

affidavit from Maria Konchak, the Senior Vice President of Human Resources, Konchak Aff. [ECF No. 55-4]. In her affidavit, Konchak showed that, of Hotwire's 551 total employees who were over 40 years old, 20 (3.6%) were terminated, and that, of the 551 total employees who were under forty, 14 (3%) were dismissed. Konchak Aff. ¶¶ 10–11. Of 791 male employees, 24 (3%) were terminated, and of 311 female employees, 10 (3%) were dismissed. *Id.* at 5, ¶ 13.

Konchak's statistics are devastating to Fernandez's claim. The disparity between terminated over-forty and under-forty employees was just 0.6%. And, of course, there was *no* disparity between terminated male and female employees.[19] Although no consensus has developed around "any rigid mathematical formula," the Supreme Court has "consistently stressed that statistical disparities must be sufficiently substantial" to raise "an inference of causation." *Watson v. Ft. Worth Bank & Tr.*, 487 U.S. 977, 994–95 (1988). Courts judge the "substantiality of numerical disparities on a case-by-case basis." *Id.* at 995 n.3. And Hotwire's tiny age disparity, based on a very small data set, doesn't strike us as "sufficiently substantial."

In her Response, Fernandez does little to rebut Konchak's statistics. She largely resorts to attacking Konchak personally, impugning her credibility, and baselessly questioning the accuracy of her data. *See* Response at 14 (mocking Konchak as "apparently chief chart designer"); *ibid.* (irrelevantly pointing out that Konchak has "no personal knowledge" of Fernandez's firing); *id.* at 15 (suggesting—incorrectly and without any basis—that Konchak's statistics are from "sometime later in April after the layoffs occurred"[20]); *id.* at 16 ("Ms. Kanchak's [sic] failure to [rehire everyone who was laid off] means she will do or say anything for Hotwire."). But none of these attacks get her any closer to a viable claim.

---

[19] As we've said, Fernandez hasn't successfully alleged a disparate-impact claim under Title VII. But, even if she had, this data would have put that claim to bed for good.

[20] Konchak was clear that her data on company terminations came from *both* before "April 3, 2020," Konchak Aff. ¶ 6, *and* "[f]ollowing the April 3, 2020 separations," *id.* ¶ 12.

All in all, Fernandez has failed to make out a claim of disparate-impact discrimination under either the ADEA or Title VII. We thus **GRANT** Hotwire's MSJ on Fernandez's disparate-impact claims.

\*       \*       \*

After careful review, we hereby **ORDER AND ADJUDGE** as follows:

1.  Hotwire's Motion for Summary Judgment [ECF No. 57] is **GRANTED**.

2.  Under FED. R. CIV. P. 58, the Court will enter an order of final judgment separately.

3.  The Clerk shall **CLOSE** this case.

4.  All other pending motions are **DENIED as moot**, all hearings are **CANCELED**, and any deadlines are **TERMINATED**.

**DONE AND ORDERED** in the Southern District of Florida, this 30th day of September 2022.

**ROY K. ALTMAN**
**UNITED STATES DISTRICT JUDGE**

cc:     counsel of record